Common Pleas Court of Cuyahoga County.

## IN RE PETITION OF COMMITTEE ON RULE 28 OF THE CLEVELAND BAR ASSOCIATION, THOMAS B. BOLTON, ET AL.

Decided March 23, 1932.

*Thomas B. Bolton, Parker K. Fulton* and *I. R. Morris,* for Committee.

*Luther Day,* for Respondents.

IRVING CARPENTER, J.

At the September, 1931, term this court was assigned to investigate complaints of violation of Supreme Court Rule 28 by members of the Bar of Cuyahoga County. Closed hearings were conducted by the trial committee, and as one result a motion was filed asking an order that the law firm of Newcomb, Newcomb & Nord be required to show cause why it should not be "enjoined from acting as regional counsel for the Legal Aid Department of the Brotherhood of Railway Trainmen," and some other injunctive orders in reference to that relationship. In support of that motion an affidavit was filed alleging that Department to be in the nature of a soliciting agency for the benefit of that firm, and that it has accepted approximately fifty cases of injured members of the Brotherhood resulting from activities of the Legal Aid Department.

In open court respondent firm denied the charge made in the motion, and extended hearings of evidence and arguments were had upon the issues thus raised.

Respondent firm as now constituted was organized in 1916, and for some years before R. B. and A. G. Newcomb had been in partnership. Prior to the adoption of Rule 28, December 6th, 1929, respondents had been more or less engaged in the prosecution of personal injury claims, and had had two or three full time salaried lay

employees, most of whose time was taken in soliciting and investigating such cases. With the adoption of Rule 28, solicitation of cases was discontinued. At all times the services rendered by respondents to their clients has been of the highest order, and their integrity is not questioned.

The Brotherhood of Railroad Trainmen is one of the old and very conservative labor unions of the United States and Canada. Its members are the brakemen, flagmen, switchmen, etc., of the operating branch of railroad service, theirs being hazardous vocations.

With the assistance of other railroad labor organizations in 1910 they obtained the enactment of the Federal Railway Employees Liability Law, and later the Federal Safety Appliance Law. In nearly every state many similar laws have been enacted. The enforcement of these safety laws has done much to prevent accidents among trainmen and the Liability laws have extended and protected the rights and remedies of those injured and the families of those killed.

For many years there has been agitation in the Brotherhood looking to a legal aid department within its organization to secure to its members a fuller enjoyment of their legal rights and remedies, especially those given them by these laws. In May, 1930, the Legal Aid Department of the Brotherhood was started in the entire jurisdiction of that organization within the United States, with its headquarters in the city of Cleveland in the general headquarters of the Brotherhood. In Canada a compensation system for railroad employees makes such department unnecessary there.

By the plan adopted, to make this department effective, when a member is seriously injured or killed in the course of his employment, that fact is required to be reported to the department headquarters in Cleveland by the officers of the local lodge of such member, on blanks for that purpose. Such information is also obtained through the benefit and insurance departments conducted by the organization, and even from newspaper items coming to the attention of officers of the Brotherhood, including

regional counsel. When an accident is reported in any of these ways, to the injured man or the family of one killed, a letter is addressed telling him of the service the Legal Aid Department can render to him, and accompanying it another blank or questionnaire asking the details of the accident and the injuries. If this report is made and any indication of interest in the service of the department shown by the member, one of the department's investigators is at once assigned to investigate thoroughly the facts relative to the accident, written statements of the witnesses are obtained and anything else necessary to a proper understanding and handling of the case is done, and all is submitted to headquarters, and the member is, in a general way, informed of the results of the investigation.

In some cases such investigation has been made even though not requested by the claimant. It is also the rule that investigators warn injured members to keep away from lawyers or their solicitors, except regional counsel. Often they have condemned other very capable lawyers. In a number of cases the Department and its officers have interfered with existing contractual relations of members with other lawyers. Such interference has always been intended to benefit the member and not to secure a case for respondents.

After the investigation, if the member has any difficulty in settling his case, if he lives in the Cleveland Region he is urged to come to Department headquarters at Cleveland where his case is reviewed by the officers in charge, and for advice on questions of liability, injuries, probable amount to ask in settlement, and other suggestions as to settlement, is taken to the office of regional counsel, the respondents herein. In some instances R. B. Newcomb has called upon such members in their own homes, or met them at convenient places in this and other states. This has been done in some cases where the prospective claimant has not even consented to the Brotherhood handling his case.

As an integral part of the Legal Aid Department regional counsel were selected in sixteen cities of the

United States and their names and addresses are carried in every issue of "The Railroad Trainmen," the monthly publication of the Brotherhood, with the suggestion that they "will, upon request, give legal advice and assistance to members of the Brotherhood injured while engaged in railroad service, and to dependents of members killed in such service."

Respondent firm was, at the start of the department, designated as Regional Counsel in this, the Cleveland territory, which includes all of Ohio, West Virginia, Kentucky, the western parts of New York and Pennsylvania, eastern Indiana and a part of Michigan.

When so referred to regional counsel the results of the fact investigation are examined and if any question exists as to the extent of the member's injuries counsel has a medical examination made and report submitted, and the member is advised as to the merit of his claim, and in many cases counsel has directly assisted in effecting settlement with the employer company. For all this service, including the investigation, no charge is made to the member except the actual cost of medical examination.

If settlement cannot be effected the member is invited and urged, if necessary, to give to regional counsel a retention contract. At first that contract provided for a contingent fee of 20% of "the net settlement, verdict or recovery had in action." By the agreement made between counsel and the Legal Aid Department one-fourth of this fee was passed on by Counsel to the Brotherhood. When some question was raised that this was a "fee splitting" arrangement, the form of contract was changed and the retainer was made 15% and a further provision was inserted in the contract by which a sum equal to five percent of the recovery is assigned to the Brotherhood, and the attorneys are authorized to collect it and pay it to the Brotherhood "to cover the cost of investigation." This five per cent fee is the only source of revenue the Brotherhood has from the Legal Aid, and it has not so far covered expenses, but in sixteen months over $30,000.00 more was used from the Brotherhood protective fund.

From the beginning of the Department in May, 1930 to

this investigation which started September 8th, 1931, in the Cleveland Region, fifty-one cases came to the Department and were settled and thirty-five others were not settled and respondents secured retention contracts in them. Of these thirty-five cases, claimants in sixteen are residents of Ohio, seven Pennsylvania, three West Virginia, three Indiana, two Kentucky, one each New York, North Carolina, South Carolina and Virginia. It does not appear that respondents or any of them had any personal acquaintance or connection with any of these claimants other than through the Brotherhood.

When respondent firm was retained as regional counsel for the Legal Aid Department, the full plan of that Department in obtaining and handling the claims and cases of its members was explained to the members of the firm, both by circular letter and in discussion, and the plan had and now has their approval.

In the circular letter of instructions addressed to all regional counsel by General Counsel McGrath, with the approval of President Whitney, the following sentences are of interest in this connection:

"Any overreaching on the part of regional counsel intended to induce members to sign contracts of employment will be discountenanced * * *." "The Bureau (Legal Aid Department) will endeavor, through the medium of The Railroad Trainman and circulars periodically sent to officers and lodges, to keep the membership of the Brotherhood advised as to the names and addresses of regional counsel in their respective districts." * * *

"In cases where members have exhausted their efforts in attempts to procure settlement, they will be referred to regional attorneys with whom contracts may be made for the prosecution of their claims. It must be understood that the Brotherhood cannot undertake to control the actions of members in this regard, and they will remain free to employ attorneys of their own choice. It is felt, however, that if the Brotherhood selects attorneys of outstanding ability in their particular field of endeavor, that fact together with the further fact that contracts will call for compensation substantially below that now charged for like service, will be a sufficient inducement to attract a great majority of members to regional counsel."

In the affidavit attached to the motion herein, it is alleged, "that said Legal Aid Department exists for the purpose of not only investigating facts of accidents to members of the Brotherhood of Railroad Trainmen, but also for the purpose of giving legal advice and of soliciting personal injury cases;" * * * "that it is in the nature of a soliciting agency for the benefit of its regional counsel."

The proof does not quite sustain this claim, but rather it appears that the Department was organized and is conducted with a *bona fide* purpose to aid members of the Brotherhood to settle their claims with their employers and hereby retain their employment and seniority rights, a valuable asset particularly to the older men. Also if settlement could not be had to insure for them able legal talent to prosecute actions for them. About the only suggestion of connection between respondents and the organization of the department is the fact that respondents recommended and urged the appointment by it as investigators three men who had been their lay solicitors when they were in that business, and two of them were made full time investigators and one part time, and until recently, when one was transferred to the Atlanta Region, all have been engaged in the Cleveland region. From the record of several cases it is apparent that these men have at least been favorable to their former employers' interests in securing business for them. Frequently have they pressed prospective claimants to come to Cleveland to confer with R. B. Newcomb, and urged the fact that he is a doctor, and in some instances headquarters officers of the Department have aided in that urge.

The real questions presented by this motion, are:

Does the acceptance of retainers by the respondent firm, through the Legal Aid Department, as thus outlined, result in a violation of Rule 28?

Or perhaps it may be more broadly stated:

Does it constitute an unethical advertising for, or soliciting or obtaining of, professional employment?

Rule 28 was adopted by the Supreme Court of Ohio,

December 6th, 1929 (122 O. S. lxxxvi), the material part of which is as follows:

"Section 1. These rules of professional conduct shall be binding upon all members admitted to practice law in the State of Ohio, and the wilful breach thereof shall be punished by reprimand, by suspension or by disbarment, as may be determined by any court of competent jurisdiction.

"The canons of Ethics of the American Bar Association are commended; and nothing in these rules is intended to limit or supersede any provision of law relating to the duties and obligations of attorneys or the consequences of a violation thereof.

"Section 2. An attorney-at-law shall not advertise or otherwise solicit professional employment. This rule shall not apply to the publication or use of ordinary professional cards or conventional listings in legal directories and newspapers.

"Section 3. An attorney-at-law shall not employ another to solicit or to obtain or remunerate another for soliciting or obtaining professional employment for him."

Of the Canons of Professional Ethics of the American Bar Association, numbers 27, 28 and 35 are claimed to be violated in some particulars by this agreement. They are as follows:

27. Advertising, Direct or Indirect.

"The most worthy and effective advertisement possible, even for a young lawyer, and especially with his brother lawyers, is the establishment of a well-merited reputation for professional capacity and fidelity to trust. This cannot be forced, but must be the outcome of character and conduct. The publication or circulation of ordinary simple business cards, being a matter of personal taste or local custom, and sometimes of convenience, is not *per se* improper. But solicitation of business by circulars or advertisements, or by personal communications or interviews, not warranted by personal relations, is unprofessional. It is equally unprofessional to procure business by indirection through touters of any kind, whether allied real estate firms or trust companies advertising to secure the drawing of deeds or wills or offering retainers in exchange for executorships or trusteeships to be influenced by the lawyer. Indirect advertisement for business by furnishing or inspiring newspaper com-

ments concerning causes in which the lawyer has been or is engaged, or concerning the manner of their conduct, the magnitude of the interests involved, the importance of the lawyer's positions, and all other like self-laudation, defy the traditions and lower the tone of our high calling, and are intolerable."

28. Stirring Up Litigation, Directly or Through Agents.

"It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit to collect judgment, or to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such a case to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the profession develoves upon every member of the Bar, having knowledge of such practices upon the part of any practitioner, immediately to inform thereof to the end that the offender may be disbarred."

35. Intermediaries.

"The professional services of a lawyer should not be controlled or exploited by any lay agency, personal or corporate, which intervenes between clien and lawyer. A lawyer's responsibilities and qualifications are individual. He should avoid all relations which direct the performance of his duties in the interest of such intermediary. A lawyer's relation to his client should be personal, and the responsibility should be direct to the client. Charitable societies rendering aid to the indigent are not deemed such intermediaries.

"A lawyer may accept employment from any organiza-

tion, such as an association, club or trade organization, to render legal services in any matter in which the organization, as an entity, is interested, but this employment should not include the rendering of legal services to the members of such an organization in respect to their individual affairs.

"The established custom of receiving commercial collections through a lay agency is not condemned hereby."

The Canons were adopted by the American Bar Association August 27, 1908, by the Ohio State Bar Association July 7, 1909, and beginning January 1st, 1910, were by the Supreme Court of Ohio made binding upon those seeking admission to the bar, 82 O. S. lxiii, and have since been continued. *In re Thatcher*, 83 O. S. 246, 252, the court gives its whole hearted support to the standard set by the canons, in this language:

"We appreciate and commend the high purposes of our brethren of the bar in the promulgation of the code and oath, and we shall be guilty of a palpable dereliction from duty if, upon any occasion, we fail to uphold the standards of professional duty which they suggest."

In view of the fact that by Rule 28, the canons "are condemned," we cannot conclude the Supreme Court intends the rule to supplant the canons, but rather they are all to be construed and applied together.

Counsel for the Committee and respondents have submitted very full briefs both on the facts and the law, and many cases are cited. An examination of all of these cases and many more from the courts of the United States and England fails to reveal any in point with the facts in this case. From this investigation of the law, it is manifest that the courts look with great disfavor upon aggressive business getting methods on the part of their officers, the members of the bar. In recent years this has been especially true. Solicitation or "ambulance chasing" had become so prevalent and so undignified and disgusting, a strong reaction had taken place against it. In New York, Wisconsin and California many lawyers have been disciplined for such violations, and Ohio has been active in this movement, in fact the adoption by the Supreme Court of Rule 28 was prompted by a petition

filed by the Cleveland Bar Association, and supported by the Ohio State Bar Association.

Repeatedly it is proclaimed that the welfare of the whole public is best subserved by a free, independent and dignified bar. The sanctity and integrity of the legal profession is more important to the public than the personal welfare of any individual members of the profession or of any special groups of individuals. These ideals and traditions have given the profession its large place in service to mankind. Solicitation of professional employment, either directly or indirectly, is undignified, and invariably leads to abuses from which the public and the cause of justice must suffer.

Does the Brotherhood plan result in solicitation of business for respondents? The fact that it has in sixteen months brought to them thirty-five cases from nine states, with none from Cuyahoga County, gives us our first answer. The officers of the Department say it is just getting started and they expect to build it up until it will control all the claims of its members.

But it is said the cases were not "solicited," that depends upon definition of that word. Certainly they were "obtained" for respondents, and few if any of them would have come to them but for the system. The question is asked by respondents' counsel "when does the soliciting begin?" When the Legal Aid Department asks the local lodges to report all serious accidents to its members. It ends when the contract is signed with regional counsel. Not all that intervenes can be called soliciting, many good and proper services are rendered to the claimant members, but along with them is the sure result that the unsettled case will come to regional counsel if the forces of the Department can put it there. In this regional counsel play an active part.

The rule of the Department that denies to the member who does not employ regional counsel the benefit of the investigation made by it, is another device that makes for certainty in securing the retainer for regional counsel. President Whitney of the Brotherhood says this informa-

tion will be released in the future, but General Counsel McGrath says it cannot be done.

But it is urged that all this is to the interest of the 170,000 members of the Brotherhood and their families. Under the personnel of the department as now constituted, this court agrees with that assertion. Does that justify a departure from the time honored and time tried standards of the profession? We can think of many worthy groups which might from self benefit claim the same privilege. The proposition must be tested by the measure of the whole public benefit, not that of a single group, even though as fine, as large, and as worthy as is this great Brotherhood.

This system in the hands of persons less capable, less honest or less sincere than those now in charge of it, might easily become as injurious to the members of the Brotherhood as it now seems to be beneficial.

Canon 35 (*supra*) which deals with the subject of "Intermediaries", mentions two exceptions to the restrictive principles there expressed.

"Charitable societies rendering aid to the indigent, are not deemed such intermediaries." The Brotherhood is surely not in this exception.

In the second paragraph of this canon this language is significant:

"A lawyer may accept employment from any organization, such as an association, club or trade organization, to render legal services in any matter in which the organization, as an entity, is interested, but this employment should not include the rendering of legal services to the members of such an organization in respect to their individual affairs.

"The established custom of receiving *commercial collections* through a lay agency is not condemned hereby."

The expression of the exception as to "commercial collections" must compel us to conclude an exception as to *personal injury collections* was not intended. Rule 28 has no exception as to intermediaries only as it by commendation of the Canons includes those there expressed. Until

the rule making power, either by express provision or implied construction, places such exception in the rule, this court cannot raise one.

Respondents claim that to grant any of the relief here asked and take away from the Legal Aid Department its regional counsel will destroy that department. This does not follow at all. No one can make a better investigation of the member's case then this department, and this can be done. The results of that investigation can and should be made available to the member and his counsel either for settlement or trial of his cause.

But it may cost him more. This raises the whole problem of fees. The first retainer contract used by respondents was clearly a fee splitting arrangement, 20% was collected and 5% paid to the intermediary, the Brotherhood. The result of the later contract is exactly the same as the first. The fee to the lawyer and that to be intermediary are tied up in the same contract. Why the member who is so unfortunate as to have to employ lawyers and litigate his claim is the only one asked to contribute to the department, was not explained. The one who, aided by the investigation and assistance of the department, makes a succesful settlement of his claim gains from it as much as the one who must sue. It is not clear why he should not contribute his five per cent too.

In the resolution of the Convention creating the Department this plan of financing was adopted (Resp. Ex E6).

The modest contingent fee of fifteen per cent which regional counsel receive for their service is exceedingly fine for claimants in this region who therefor get the able services of respondents. But if the low rate is made possible by the quantity of business this plan is able to deliver to regional counsel, and it is in large part such as would not otherwise come to them, we have another answer to the question whether cases obtained in this manner are solicited.

It was argued that without the Legal Aid, including regional counsel, the injured members will be victims of high speed chasers on one hand and grasping claim agents on the other. Even three wrongs do not make one of them

right. It becomes the bar, with the aid of the courts, to go forward with its program to destroy the chasing practices of its members or cast them out of the fold. When that is done the bar can, with persuasive force, appeal to the legislative power to correct the overreaching of claim agents.

May I digress from the record for a moment to say that in the closed investigation conducted by the Bar committee before this court, it was revealed that some of the work of some claim agents was not less than shocking to the sense of fairness and right. At a time when humble men and their families were distressed by pain and sorrow, and in need, faced with possible loss of earning power, conscienceless claim agents, seeking prestige for themselves in the esteem of their, perhaps conscienceless, employers, pressed most unjust and inadequate settlements. This should not be possible. The remedy for this is beyond the power of the courts, it is legislative. All claim agents and claim departments are not in that class, many are as fair and reasonable as men in such relations can be expected to be.

In oral argument it was urged that respondents had not "wilfully" violated Rule 28. It must first be determined whether acceptance of the Brotherhood plan results in an unethical obtaining of retainers by respondents. If it does, they know all about every phase of the plan and acceptance by them of such retainers, knowing as they do how they came to them, is intentional and "wilful" on their part.

In Canon 28 we find this language, "But solicitations of business by circulars or advertisements, or by personal communications or interviews, *not warranted by personal relations*, is unprofessional." It was urged in argument that there were "personal relations" between respondents and their Brotherhood clients. That relationship is official, not personal. It results from the fact that they are, as regional counsel, officers of the Department. Such relationship might be created by organization of any similar group.

Where are the equities of this cause? What interest involved most needs the protection of the court? Not that of members of the bar, this proceeding cannot be justified on the ground of self interest of lawyers in general or of respondents in particular, if there is a greater interest, and there is, the whole public. Its interest is superior to that of the Brotherhood group, and if the two are in conflict the larger must prevail.

To deny the relief here sought this court must place its stamp of approval upon this plan, the result of which is the "obtaining," if not "soliciting," of professional employment in the volume and from this far flung region of nine states, through the intermediation of this department. To do so is to say to other groups, if it will enhance the interests of the individuals of that group, they may, by organization, place all their professional business, legal or otherwise, in the hands of such professional individuals as their officers may select. Because of the higher interest of the whole public in the freedom of its professions, upon which the public welfare so much depends, this court must disapprove the lawyers' connection with the Brotherhood plan as now constituted. Can this disapproval be expressed by injunction?

The punishment provided in Rule 28 is reprimand, suspension, or disbarment, and these have been the accepted means of dealing with violations of rules of professional conduct and ethics. Are they exclusive?

In 1928, at the instance of the Akron Bar Association, the Common Pleas Court of Summit County conducted a similar investigation, and the remedy there applied was injunction restraining offending lawyers from prosecuting further solicited cases then pending or any future solicited cases. (26 Ohio Law Reporter 515).

In the case of *People ex rel Chicago Bar Assn.* v. *Berezniak,* 292 Ill. 305, 127 N. E., 36, disciplinary punishment was sought because of solicitations by advertising, in violation of Canon 27.

The court held the case one not calling for even a reprimand, but expressed its disapproval of the respond-

ent's conduct, and restrained its continuance in the following language:

"If respondent shall hereafter refrain from all improper methods of advertising as herein indicated, we will not take further cognizance of his actions, except to pronounce his conduct as very improper and as deserving very severe censure by this court."

The object of this effort is corrective, and if that can be accomplished in the future by the milder remedy of injunction against the alleged violations of the rule, certainly the court has power. to exercise such common remedy for that purpose.

How far shall the injunction be extended?

The motion asks that respondents be restrained:

1. From acting as regional counsel for the Legal Aid Department.

2. From prosecuting further cases already obtained through the Department.

3. From accepting future cases through the Department.

4. For "further orders and remedies."

The object here being corrective, the relief granted will apply only to future relations as asked in items one and three. It is not necessary to interfere with pending cases, and request number two will be denied. By stipulation, entered at the beginning of the open hearing, item four was eliminated from consideration at this time.

Exceptions may be noted for respondents, and bond for appeal fixed in the sum of $500.00.